fics, 2012-16-47. The District Court entered summary judgment that Boston Scientifics' promiscent does not meet certain claim limitations in any event. Both aspects of the Court's ruling should be reversed. The license ruling rests on a misinterpretation of a license agreement between CORDIS and Abbott. The Court misinterpreted the agreement by construing a restriction on the license in a way that conflicts with its ordinary meaning with the rest of the contract and with the intent of the parties. The non-infringement finding rests in part on a similar failure to give the ordinary meaning to ordinary words. In this case, in construing the claim limitation circumferentially  CHIEF JUSTICE ROBERTS, JR. One question. This is really a hot way of a housekeeping matter. We have a confidential appendix, at least in the version I have. All provisions of the  MR. BOSTON SCIENTI v. CORDIS CORPORATION v. BOSTON SCIENTI v. BOSTON SCIENTI v. BOSTON SCIENTI v. BOSTON SCIENTI v. BOSTON SCIENTI v. BOSTON SCIENTI v. BOSTON SCIENTI v. BOSTON CREAMER Yes, we can, Your Honor. It was, and I apologize for this, but there was, because there is another party involved, actually a Non-Party involved, Abbott and the agreement was supposed to be kept confidential so things were designated confidential. Obviously, the District Court's opinion discussed as many of these provisions. Thank you, Your Honor. JUSTICE GINSBURG On the license agreement, even if we agree with you that perhaps a strict reference to Delaware law shouldn't apply in terms of the Delaware corporate statute, why is it that you shouldn't be sort of, you know, limited by your own choice of language? I mean, you're a sophisticated company with a sophisticated counsel. You didn't put the word acquisition in there. You just put merger or consolidation. Why shouldn't you be limited to what those terms are? CREAMER Oh, well, Your Honor, I have a couple of responses. First of all, if we get away from incorporating the Delaware statute, and there are a number of reasons why that shouldn't be done, the ordinary meaning of merger and consolidation is not necessarily the kind of transaction reflected in those statutes. In fact, the District Court at footnote 4 of 820 laid out the ordinary definition, which is a process of uniting or combining, an instance of being united or combined, and acknowledged that those are broader meanings than... JUSTICE GINSBURG Doesn't even that imply, though, that, you know, one soul is left standing? I mean, in other words, that one entity is created? CREAMER Well, I think what it implies is that things are combined, and not necessarily one legal entity, you know, one corporation is left standing. If you look at the record on the transaction here, ABA itself consistently described this transaction as uniting guidance business with its business to create a single vascular devices business, to create one of the world's leading vascular devices businesses. So we think under the ordinary meaning, that is the non-technical statutory definition of merger and combination, a properly instructed jury could find that there was a merger or a merger. Certainly, you know, this was decided on summary judgment. There certainly ought to be enough for a jury question. JUSTICE GINSBURG So this is an asset purchase of guidance? CREAMER It was both, Your Honor. It was a purchase of the Advanced Cardiovascular Systems subsidiary and some additional assets, which ABA then brought into what it calls its ABA vascular division. So it was both a stock purchase and an asset purchase. JUSTICE GINSBURG Yeah, which is a wholly owned subsidiary or a division? CREAMER It's a division that includes this subsidiary as well as, as I understand it, some other units or assets. It's a division, frankly, in the sense that division is used in the license agreement. That is not a separate corporation, but a business unit, you know, in which certain assets or other units are organized for organizational purposes. And that's an important part of the definition of major competitor in the license agreement. JUSTICE GINSBURG Now, you don't think that an unambiguous reading of the license agreement would result in a judgment in your favor, do you? I think, as I understand your argument, is that, okay, maybe there's some ambiguity here, but we need to look more broadly. CREAMER Well, I think I have two responses. One is, we do think the contract is unambiguous. We think you ought to, if you use merger and consolidation in their ordinary, you know, dictionary sense, not the statutory sense, that the agreement is clear then, because then you don't have this inconsistency between merger and consolidation and divisions and businesses, and the fact that non-Delaware corporations were included and all of that. But then what you have is you have a factual issue about whether there was a merger or consolidation within the meaning of the agreement. And we think that then, that would go back for trial on that issue. JUSTICE BREYER Suppose we agree with it, but we think that the court didn't err in its random summary judgment of non-incriminatory reasons. CREAMER Well, if you agree, the short answer is no, there wouldn't be if you agreed. Obviously, we don't want you to agree, and perhaps I should turn to the non-incriminatory... JUSTICE GOLDBERG Well, I think the question is, does the license agreement ruling have any broader impact than just this individual circumstance? So, does it essentially get mooted if we find that the infringement determination was correct? CREAMER I think, for purposes of this case, if you find non-infringement as a matter of law of all the claims, then the license agreement really is irrelevant, because there wouldn't be any infringement for purposes of this case. Now, what implications it might have elsewhere, I don't know. JUSTICE GOLDBERG I think that's the question, what implications would it have? Does it create broader implications with respect to the relationship between these entities going forward? CREAMER I honestly don't know the answer to that question, Your Honor. I don't think so, but I haven't thought about what it might mean outside the confines of this case. But I think for purposes of this case, if you were to conclude non-infringement as a matter of law, then it doesn't matter whether they're licensed. So, I think that answers your question, Judge Walling. JUSTICE SCALIA So, what did you say, just getting back for a quick moment to the licensing issue, if it went back, you said there could be a factual issue, and were you thinking in terms of a jury getting into the facts of the Abbott Guidant acquisition? Is that what you were thinking? CREAMER Yes, that's what I was, when I was responding to Judge O'Malley's question, that's what I was talking about. Now, there also is another potential factual issue, and that's this. If a court concludes that a contract is ambiguous, and the court can conclude that whether or not the parties can say it's not ambiguous, and under Delaware law the court can still say it's ambiguous, and the court finds that the extrinsic evidence does not compel one reading or the other, then that is a factual question under Delaware law. And so, in theory, you could have that issue for trial as well. So, there would be two potential jury issues with respect to the license, Your Honor. Now, on the non-infringement question, first with the 817 patent, that's the one that requires that a connector joining two of the rings include at least one circumferentially extending turnback portion. Now, it's undisputed that that's not a term of art in the field, and it's also undisputed that the patentees did not act as their own lexicographers with respect to that term, and the district court also did not find that there was any disclaimer. And it found that the construction proposed by Boston Scientific, that is that circumferentially extending turnback portion means the same thing as undulating, isn't consistent with the claims, but the court nonetheless adopted that construction. We think that was a mistake. What the court should have done was apply the ordinary meaning of the claim language. And when ordinary words are used in a claim limitation, and they don't have a special meaning in the art, and they aren't specially defined in the patent, you give them their ordinary English meaning. And if you have several of those words in a limitation, you use all the ordinary meanings to construe that limitation. Let me ask you, one of your arguments is that, well, we've got to turn this on its side, and when we turn it on its side, it becomes, it has a turnback portion, or, but, if you're talking about a longitudinally extending connector, shouldn't we be looking at it on the longitudinal plane? Well, and that really goes to a different question, not so much circumferentially extending the turnback portion, but what undulating means. And I have a couple of responses to that. One is, first of all, even if you look at it, even if you look at PROMIS, and you say, okay, you've got to look at it longitudinally, we still think that it meets the requirement of undulating, rising and falling in waves, thus having a crest and a trough. Yes, because of the little... Exactly. And again, this was summary judgment. We think certainly a jury with expert testimony and all of that, and looking at the accused product, could find that that's undulating, even with a longitudinal requirement. Second, we don't think that there is this longitudinal requirement, even if the connectors have to be longitudinally oriented. And depending on the claim, some of them do. What we're talking about here is not undulating longitudinals, which is the term that Boston Scientific repeatedly uses, but an undulating portion of a longitudinal or undulating portion of a connector. So it's only a portion that has to be undulating. Nothing in the claim construction or in the normal meaning of the word undulating suggests any particular orientation. And in fact, if you understand undulating as it's been defined here to mean rising and falling in waves and all of that, well then by definition, some part of it, some portion of the connector is not going to be longitudinally oriented because it's going to be rising and falling. So we just don't think that that requirement is part of the claims. The patent at several places in the specification refers to undulating as a shape, as an undulating shaped wire and that sort of thing. So again, it's not talking about an orientation, it's talking about a shape. But I think the short answer is the one I started with, which is even if you accept that reasoning, a properly instructed jury could still find that PROMIS' connectors have undulating portions. Okay, so let's go back to the claim construction for a second before your time runs out. I'm having a hard time understanding the portion of the claim that talks about the two endpoints connected to different and adjacent circumferential rings. Where are the endpoints in this? The endpoints are, if you look at the drawing, I think it's on page 46 of our blue brief. Are you talking about figure 8? No, I was talking about the picture of PROMIS, which I think shows it. Yes, it is 46. The end portions of the connector on this, I believe are, I don't know if your Honor has the picture in front of you. I do. On the left side of the page, I think it's where the orange and the light blue section come together. This is a Boston Scientific drawing. I think that's where they would say the end of the connector is. And then at the other end is where the green comes into the orange part there. So, that's the connector and the undulating portion is the blue curve, the purple curve, and then the blue curve. So, where are the endpoints? I think the endpoints are where you have the orange meets the blue on the left, and the green meets the orange on the right. Okay. Alright, so then can we look at figure 8? Sure. So, looking at figure 8, where then do those endpoints exist? I believe that they exist where they come in contact with the circumferential rings. So, at the straight point, where they're straight here in figure 8? Yes, I believe so. Okay, so if there's two endpoints, you clearly have to have the full up and down on each side in between, right?  Alright, well, you argue with respect to figure 8 that we should decide that the circumferentially extending turn-back portion is basically half of a U, right? Well, it can be, and the decline endpoints make this clear at times 14 through 16, it can be a single U shape. It can be a circumferentially extending turn-back portion. Okay, so how does that single U shape have two endpoints? The single U shape doesn't. The connector has to, but again, it's only a portion. The claims only require that a portion of the connector be circumferentially extending or the other claims be undulating, not the entire connector. So, I don't think, Your Honor, that the endpoints matter for purposes of these claims because you're only dealing with only a portion of the connector or a portion of a longitudinal that you need to be concerned about. Okay. If the court has no further questions, I'll... Yeah, we've used up your time. How about we'll restore three additional minutes. You'll have three and a half minutes and we'll give your friend on the other side three minutes. Thank you, Your Honor. Okay, Mr. Wolf. Thank you, Your Honor. My law clerks always tell me that you guys might not actually consider yourself friends during the middle of the battle, but... Your Honor, we get along quite well with opposing counsel in this case and in most cases. The agreement at issue is by its term not just governed by Delaware law. It is to be construed, interpreted, and governed by Delaware law. Yet, remarkably, appellants offer no statutory, jurisprudential, regulatory, any definition under Delaware law that the transaction at issue in this case would meet. So, let's go before the transaction. There existed ACS, Guidance, Abbott, and Boston Scientific. Under the terms of this agreement, Abbott was free to purchase stents from ACS. Remember, and there were an awful lot of equitable arguments in appellant's brief about how it's unfair that we're holding them to a relatively strict definition. Your Honor pointed out that, frankly, in any definition, there may well not be just one person standing. But there were lots of equitable arguments in the brief. Well, the problem is that Abbott thought have made rights as well. So, Abbott could have purchased the stents from ACS, then owned by Guidance, and turned around and sold them to Boston Scientific, and then Boston Scientific's sales would have been authorized, and patent rights would have been exhausted. All that happened in this case is that the stock went from being owned by Guidance to being owned by Abbott. To this day, sitting here today, ACS is an independent company incorporated in California. Abbott is an independent company incorporated in Illinois. But it wasn't just the stock, it was the assets as well, right? There was no allegation below that the assets had anything to do with this provision. And to be clear, Boston Scientific buys from Abbott, not from ACS. So, Abbott is authorized to sell. There was no suggestion below that somehow Abbott's ability to sell was in any way implicated by assets. What Abbott does is get to be concerned with the intent of the parties in drafting this agreement. Your Honor, that's exactly why I started with the equities. If that's the litigation-inspired intent, and note there's no record evidence that this was Abbott's intent, there's no draft of the agreement, there's no letters of intent. The only intent of the parties is their current deposition testimony. But if that's the intent of the parties, then the have-made right that J&J unambiguously granted makes no sense at all. Because the thing that the CEO of J&J said they wanted to avoid, they completely undermined their granted have-made rights. They could have gone to the world's biggest scent manufacturer and said, please make me scents, get the scent, turn around and sell it to anybody else. So that entire equitable construct in the briefs completely collapses under the have-made right provision. But part of the problem is if you look at the license agreement, it's clear that what they're concerned about is basically having licensed their major competitors. Right? I'm not sure. I don't think that's clear. Because if you look earlier in the provision, for example, there are specific discussions of what happens if there's an asset acquisition or if Abbott sells off part of their business. I don't think that that is so clear. I mean, there are four or five different provisions in the one where we're looking at the last sentence. And they talk about a number of different scenarios. And as I said, if it were that clear, then the have-made rights would make no sense. Well, they specifically said that if there's a merger or consolidation of Abbott with a major competitor, the license granted shall not extend to the business of such major competitor. And there's testimony. Extrinsic, but there's testimony about that intent. Correct. All right. But my problem is when you look at the definition of major competitor, what has happened here is that Abbott itself became a major competitor. And what I'm trying to understand is, could they possibly have been worried about merger or consolidation with a major competitor, but wouldn't be worried about a deal where they turn themselves into a major competitor? Your Honor, we could speculate about that. Again, with that have-made issue, and I don't want to belabor that point, all of this is for naught. Abbott could have bought and sold stents from anybody in the world, including the biggest stent manufacturers out there, and what J&J was purportedly concerned about would come to pass. So it did a very, very poor job of buttoning down that agreement if this is what it was really about. I think what they were more concerned about, at least the way I read that entire provision, is that Abbott itself would be acquired. So if Boston Scientific had bought Abbott, then the intricacies would have worked the way they suggest. But Abbott could sell. Abbott could have made. And that's exactly what they're doing now. The fact that they own ACS rather than a guy who owns ACS is irrelevant to the analysis. There were two independent companies before, Abbott and ACS. Abbott was free to buy and sell from them then. There are two independent companies today, Abbott and ACS, and Abbott is still free under the have-made right, as well as the affiliate right now, because they own them, to turn around and sell to Boston Scientific. Can you answer the question that we asked before, which is does the debate over this license agreement have any legs beyond this case? Not to my knowledge, Your Honor. We don't know of any. Sitting here today, I'm relatively familiar with the business. I'm not aware of any implication other than it obviates all of the infringement and outlaw concerns that may be brought up that otherwise might have to be dealt with. But I'm not aware of any knock-on effect for other issues. Do you agree, Mr. Nagle was saying that he thought there were factual issues that would have to be addressed on the merger issue, on the license issue. You heard him say that. Yeah. I'm not aware that that was ever raised below the ground to oppose summary judgment. I'm not sure what there is left to discuss. We have a contract to be construed under Delaware law. The structure of the deal has never been disputed. The fact that ACS is an independent, has remained an independent, incorporated company. There's no bail-piercing allegations to my notion. I mean, in theory, that could be a fact issue had it been raised. But there's no bail that allegedly needs to be pierced, so I'm not sure what the fact issue would be. I'd also add that there's an arbitration provision that could come into play that we don't have to deal with today, but I'm not even sure it would go to a jury if there were a fact issue. Let's get to the infringement issue. Absolutely. The two stints that we're talking about in terms of the earlier case and this case are slightly different, are they not? Yeah, in fact, the near stint is, in theory, closer to their claim. Your Honor, I know it was casual, but when you drew the shape, you actually drew the near shape, which is that dipped down slightly, the rabbit ears. And fortunately, you already pulled out 46, page 46, if we could look at that a moment, the rubric. We can see that the rabbit ears of the near stint don't exist with the stint accused today. It comes up, and then it flattens out. So when this court said in the near case that near U loops merely level out, and they lack the change in direction required for literal infringement, that is all the more applicable here, because we literally have a flattening. Your Honor, the court's construction of rising and falling in waves, thus having at least a crest and a trough, is unchallenged. And the court held, as I said, that when you level out, you can't meet the limitations. There were really two arguments raised. And let's be clear, Your Honor. BSC's position in this case all along has been these undulating claims should never have been brought. We moved to stay these claims pending the courts to show one opinion, because we believe that, based on whatever happened in that opinion, they had no argument. I don't want to go too far past the record before you, but there is a motion for sanctions that's been stayed, because we believe these undulating claims should never have been brought and should at least have been discontinued once the Fischel 1 opinion came down, because it is so clearly similar. But the first argument they made below was essentially that this court in Fischel 1 changed the claim construction opinion. They said to the district court, well, there's this point of inflection and two curves argument. That's largely been abandoned here before you today. Their first way of trying to get around Fischel 1, that there was a modification of the original claim construction position. But the second argument, Your Honor, hit on, which is the point of reference. Let's be clear. This pen is not currently rising or falling. What they'd like you to do is to turn your head. And that's really important, because every single claim at issue in this case has frames of reference. Every one mentions a longitudinal axis. Every patent has some rubric, some framework, where we're talking about circumferential, and this patent really is about hoop strength. I mean, this is a kind of tangential part of what we're talking about today. It's really a tangential part of what the Fischels believe they had invented. What they really thought was a way to get that circumferential ring stronger. But every single claim has a circumferential component and a longitudinal component. The 604 patent talks about, on the one hand, closed circumferential zigzag statements. On the other hand, longitudinal is extending in a substantially longitudinal direction. The 817 patent, circumferential rings versus longitudinally extended connectors. The 240 patent, circumferentially relative rigid portion versus longitudinal. So every single claim has a frame of reference, and for 10 years, the parties have been litigating this case, understanding that frame of reference. Well, faced with this Fischel 1 decision, J&J suddenly said, well, no, we're not going to bring any more to the frame of reference. We're going to say that this is rising and falling. Just turn your head. Well, not only does the entire record of this case belie that argument, but the language of the claims themselves belie that position, as does the specification we cited, for example, column 2, lines 3 through 5, specifically saying the longitudinals connect the circumferentials. And the question is, does the longitudinal have crests and troughs? Now, let me ask you about that. You really seem to endorse the district court methodology for getting to where the court got. In other words, the notion that I have to construe it this way to save it from an indefiniteness. In terms of the circumferentially extending Your Honor, here's what we see the district court did. And I agree largely with what Mr. Trello said. There's no dispute that these terms are not found in the art. There's no dispute that they're not construed or described in the specification. The district court then said, I don't know what these terms mean in a vacuum. At 827, she has an entire paragraph where she says, I don't know what these words mean. I don't know what to turn back relative to what. In fact, there's a little bit of sleight of hand going on here because Cordes, on the one hand, said these have plain and ordinary meanings. But they weren't content with the plain and ordinary meaning of the words. They, in fact, argued for dictionary definitions and then immediately abandoned the dictionary definition in favor of their phraseology. For example, turnback portion. There's no suggestion that turnback portion  They say it has a plain meaning, but then they cite a dictionary. Their dictionary, they say, for turnback is folded back on itself. But they didn't propose that to the district court because it would, like Judge Robinson found, that would be confusing. So they paraphrased the dictionary definition to a portion that extends back in a general direction from which it came. So we have this kind of, well, is it a dictionary? Is it plain meaning? It just proves Judge Robinson's point. I don't know what these words mean. So since I don't know what these words mean, I'm going to look to the specification and say, what's the closest thing to it? What's the best way to ascribe meaning to these inherently ambiguous five strung together phrases? Well, what about the dependent claims where they describe it as a U? Does that help? It is a non-factor. Because that's a claim, at least I'm forging it off the top of my head. It's a comprising claim. So imagine you would have a U and a V. That would undulate because you have the rises and falls, crests, and troughs. But only one of the two parts of the undulation would be a U. So that would satisfy Claim 14. I believe Judge Robinson pointed out a claim differentiation issue that actually didn't exist because she didn't notice the comprising component of it. So Claim 14 actually doesn't present a problem at all. Now, what she said is this insolubility problem would trump it if it was a claim differentiation issue. We don't think she needed to go there. We, in fact, think she made the job a little harder on herself than she needed to. But she reached the right result for the right reason, which is if it doesn't be undulation, then what the heck does it mean? And, of course, what they would have you do is subdivide the undulation in half. There's no blaze mark here. There's no suggestion that you can do that. There's nothing in the patent at all that suggests that half of that, that U shape, is relevant to this patent. So just as arbitrarily... Well, what about the fact that they use the word portion? I mean, they're not talking about the entire undulating thing, right? Your Honor, that's absolutely right. And I agree with Mr. Crowley's assessment there. If you imagine, and I realize this is unorthodox, but may I draw it just for a second? Yes, please do. If that was the longitudinal... If that was the longitudinal, this would undulate, and it would be an undulating portion because you have these straight portions over here. So there is no doubt that, and we're not claiming, and we've never claimed, that the entire longitudinal must undulate. There must be a portion. Now, there are some figures in the brief that are, you know, with a predictor's page, but where they have tiny little undulations. As a matter of set design, you can't do that. There are some drawings in the briefs that just can't be laser cut like that, that are entirely hypothetical. But we do acknowledge that if you had some straight portion, but then that undulation in the middle, that that could, all else being equal, everything else being met in a claim, that could count. But there is nothing, nothing in the specification that says that that is of note at all. There's not another term for it. They don't suggest that that can be subdivided. So you think we could agree with the trial judge that this claim means the same thing as undulating, but conclude that there was no need to essentially invalidate Claims 14 and 15? Absolutely, Your Honor. Absolutely. And in fact, in the opening brief, court has cited the Bank Corp Services versus Hartford Life case, and I thought it interesting that they did so because in that case, the phrase at issue was surrender value protected investment credits. And the court found that the rest of the phrase, the last three words, had meaning in the art, but surrender value didn't. But elsewhere in the patent, there was the phrase stable value. They said, well, since they seem to be talking about the same concepts, we're going to say they're talking about the same thing. And that's exactly what we have here. The only meaning that could be ascribed here is undulating. Unless there are any other questions, I'm into my added time. No, thank you. Thank you very much. Mr. Traub? Thank you, Your Honor. Starting briefly with the license issue, Mr. Wolf started out by saying that there's no transaction here that, essentially, he went back to the Delaware statute. There's no transaction here that could meet the requirements of Delaware law. I think it's important just, and of course, we don't think the statute is incorporated into the contract. I think it's important to realize that there's nothing in Delaware law that says that you can't have something that's a merger or consolidation that doesn't meet the requirements of the statute. The statutes are permissive. They say, basically, if two or more corporations, one of which has to be a Delaware corporation, want to go through a transaction that ends up with one corporation, either one of the two or a new one, here's how you do it. It specifies you've got to have a merger agreement, you have to have particular shareholder votes, and it's about a 15-page statute, but the only part that anybody's focused on is that first sentence. There's nothing under Delaware law that says you can't have a merger or consolidation of other business units. It's perfectly common to talk about merging or consolidating offices or divisions or any other sort of business unit. This is not a Delaware law problem. There's nothing inconsistent with Delaware law here. Mr. Wolf also spent a fair amount of time arguing about the half-made provision of the AVID license. That's not an argument they made at all in their brief. They did allude to it in the lower court, but, in fact, you'd have the same issue no matter how you construe the major competitor exclusion, either their way or our way. That half-made argument, we think, is just a diversion. But his point is that AVID could have effectively done the same thing, right? Well, that may well be, Your Honor, but the parties contracted this way, and AVID didn't do it that way. AVID did it another way, and we think that's exactly what, and who knows what the reasons are. We don't have enough extrinsic evidence to fully develop that, but what the parties contracted for was that if AVID acquires the business of a major competitor, division or business of a major competitor, the license won't extend to that business. There's no dispute that PROMIS is coming from that business. So, we don't think the half-made argument has anything to do with this. Now, Mr. Wolf also said that the near shape is actually closer to our claims, and that's just not right. If you look at the picture of the blue brief at page 11, the near shape, the shape that, I mean, we argued that the near connector had a different shape, but our argument was rejected in the prior litigation. The near, the connector that nears is a simple U, and that's clear from this court's opinion where it went through the ABC endpoint analysis. The court concluded that the right endpoint was where the U just flattens out. It's just a U. It doesn't continue into the shoulders, and even Boston Scientific's own drawings of PROMIS include those shoulders, those curved shoulder segments. So, near is very different for purposes of these claims from PROMIS, and as far as the judge's analysis of circumferentially extending turnback portion, she didn't actually say that she didn't know what these words mean. She said that she didn't find definitions in the patent. She didn't consider the ordinary meaning, and as far as blaze marks and the other references. Well, I think she said that there was, it was undisputed that there was no ordinary meaning. No, it was undisputed that it had no meaning in the art, but it was not, it was very definitely disputed that it had ordinary meaning. I mean, these were ordinary English words that had ordinary English meanings, and the final point I'd like to make is that the references to the specification, the blaze marks, and whether something is or is not supported, those are validity issues. They should not be entering into claim construction. If applying the ordinary meaning creates validity issues, that's a matter for remand under the proper clear and convincing evidence standard. It's not something that you short-circuit through claim construction. Thank you very much. Thank you, counsel.